SARAH PERRINE'S EXECUTORS

*v.*

CHARLES B. NEWELL et al.

[Filed July 16th, 1901.]

An owner of land, part of which adjoined the Delaware river and was below high tide, but embanked against tides with other lands, under the provisions of the Meadow act of November 29th, 1788, and its amendments and supplements (*Gen. Stat. p. 2022*), devised said lands to trustees for the life of his son Charles, and, upon his death, to Charles' children. It was held in this court that the trustees under the said will took an estate for the life of Charles, and that Charles' children took a vested

interest in the remainder. During the life of Charles, the banks of the meadow were several times broken, and the meadow company repaired the same and imposed on the meadow so devised an assessment for the cost of such reparation. The trustees advanced money to pay the same, and before their expenditures were repaid, the life *cestui que trust* died.—*Held,* that expenditures for such reparation by trustees for the life of another, might be reimbursed out of any income coming to the *cestui que trust* for whose life they held title, but were not chargeable upon his children who had a vested remainder in fee subject to his life estate.

*Mr. William T. Hilliard,* for the complainants.

*Mr. Clement H. Sinnickson,* for the defendant's trustees.

MAGIE, CHANCELLOR.

This cause was brought to hearing on the pleadings and proofs, and a decree made thereon February 23d, 1892. The opinion of the late chancellor is reported in *Perrine* v. *Newell, 4 Dick. Ch. Rep. 57.*

The decree recited that the mortgage sought to be enforced upon the lands described in the bill was a lien upon the interest of the defendant Charles B. Newell, and of the defendant Charles W. B. Newell therein, and those defendants were foreclosed of a right to redeem. It charged upon the interest of the defendant Eliza A. Bradway and the defendant Deborah Tufts, in the same lands, a debt due the complainants upon a bond belonging to the complainants and intended to be secured by the said mortgage. It referred the cause to Master Acton, to ascertain and report the amount due complainant upon the said bond and the mortgage intended to secure it, and also to ascertain and report the amount due to William Newell and Elijah W. Dunn, trustees under the will of James W. Newell, deceased, for advances made by them upon the said premises, to be ascertained under rules laid down in the opinion of the chancellor.

The facts on which the judicial action proceeded sufficiently appear in the chancellor's opinion above referred to. His conclusions were that the trustees under the will of James W. Newell, deceased, held title to the lands in question for the life

of Charles B. Newell; that Charles B. Newell had an equitable estate in the lands which he could mortgage, and which he had mortgaged to secure the bond of the complainant. He also determined that at the death of James W. Newell the children of Charles B. Newell took, under James W. Newell's will, a vested remainder in the said lands, subject to the life estate of their father, and could mortgage their interests. He also found that the mortgage in question, made by Charles B. Newell and by Charles W. B. Newell, his son, and by Eliza Bradway and Deborah Tufts, his daughters, was good as to the estate of Charles B. Newell and the interest of Charles W. B. Newell, but was void as to the interest of Mrs. Bradway and Mrs. Tufts, because they were married women whose husbands had not joined in the mortgage; but the debt evidenced by the bond was imposed as a lien upon their interest, because the money advanced had been expended for the benefit of their estate. He also found that the trustees holding the title for the life of Charles had made certain expenditures in the execution of their trust, which remained unpaid to him, and that they were entitled to hold the lands during his life, until such expenditures should be reimbursed to them.

The master to whom the matter was referred made a report December 17th, 1896. He found that $2,058.17 was due to the complainants, who are the executors of Sarah Perrine, who was the complainant at the time the decree was made. In respect to the amount claimed to be due the trustees for advances made by them, he reports that in order to ascertain what expenditures should be allowed the trustees, he needs to have further instruction in relation to certain items of their claims.

The matter has been presented as if on a motion for further instructions to the master. If the opinion of the late chancellor sufficiently indicates the rule which should govern the master, no such instructions would be proper; but if the changed circumstances indicate that instructions are proper, they should be given, or if the master's report enables a proper decree to be made without further reference, such a decree should be made.

The master, by his report, specially refers to expenditures claimed to have been made by the trustees in respect to which

he is uncertain, as being divided into four classes, only three of which need be considered: (1) payments made by the said trustees to Charles B. Newell, the *cestui que trust,* there being at the time of such payments a deficit due to them; (2) charges for interest paid by the said trustees, when it appears that they had borrowed moneys upon their personal obligation for the purpose of such expenditures on the trust estate, and that they have claimed interest upon each deficit shown by said account; (3) allowance for certain expenditures made of questionable advantage to the estate or the remaindermen.

The first two items relate to the expenditures made by the trustees in respect to the trust estate during the life of the·*cestui que trust,* Charles B. Newell. The opinion, and the decree made thereon, clearly indicated that such expenditures, if properly made for the benefit of their trust, could be imposed upon the interest of their *cestui que trust* in the lands in question. The decree directed the ascertainment of the amount of such expenditures for the purpose primarily of imposing them upon the life interest of Charles B. Newell. At the time the decree was made Charles B. Newell was living. He died June 10th, 1892, and at the time the master made his report the estate of the trustees in the lands in question had ceased to exist. Under the will of James W. Newell they held the land for the lifetime of Charles B. Newell, and upon his death their interest ceased, and the life estate of Charles was terminated. There was, therefore, no purpose to be served, so far as concerned the life interest of Charles, in determining what the expenditures had been.

Some part of the master's report, respecting the third item as to which he finds difficulty, seems designed to elicit the view of the court in respect to a matter which was left undetermined at the time of the decree. The opinion of the learned chancellor, after expressing the view that the proper expenditures of the trustees were chargeable upon the interest of their *cestui que trust,* and that they would be permitted to hold the lands during his life until they reimbursed themselves for such expenditures, added: "I do not mean to be understood by that

which I have just intimated that under any circumstances the trustees will not be permitted to hold the farm beyond the life of their *cestui que trust* for the purpose of reimbursing themselves; on the contrary, I can conceive that necessary expenditures for the permanent betterment of the farm may extend such right, or indeed that insufficient income to meet the proper expenses of the prosecution of the trust, either in the past or in the future, may extend it."

It is clear that the learned chancellor did not intend to declare that the expenditures of the trustees were chargeable upon the remaindermen. In respect to them, he made no determination, but directed the master, in accounting, to take testimony explaining the nature of the trustees' disbursements, so that the court might be able to determine whether any part of them should be charged upon the remaindermen after the expiration of the life estate of Charles B. Newell. The question which the learned chancellor thus intentionally left open should now be decided. It becomes necessary to determine whether the expenditures made by the trustees, or any part of them, can be imposed upon the interest of the children of Charles B. Newell, whose estate was a vested remainder in fee, subject to the life interest in the trustees for the benefit of their father, which life interest is now determined by his death.

The expenditures of the trustees, reported by the master, fall into two classes: one class includes expenditures made by them in running the farm during the life of the *cestui que trust;* the other class includes expenditures of the following character: A large portion of the land in question adjoined the Delaware river and was below high tide. Before the death of James W. Newell the owners of that land, and other lands similarly situated, had united in the formation of a company under the provisions of the act entitled "An act to enable the owners of the tide swamps and marshes to improve the same, and the owners of meadows already banked in and held by different persons to keep the same in good repair," passed November 29th, 1788, and the various amendments and supplements to the said act. *Gen. Stat. p. 2022.* During the life of Charles B. Newell, and while the trustees had title to the said lands for

his benefit, the banks which retained the tides and preserved the meadows in which the lands in question were included, were several times broken down to such an extent as to require them to be repaired. If not repaired, the part of the farm in question became valueless to the *cestui que trust.* The legislation in question permitted the association to repair such breaches and to ascertain and assess upon the lands included therein a proper share of the expense of such reparation. If an assessment thus imposed was not paid, power was given to seize and rent out said lands to such persons as would take the same for the least number of years and pay the assessment and expenses. The trustees expended money which they borrowed upon their personal security in paying such assessments, and these expenditures are within the second class I have above named.

With respect to the first class of expenditures, I think no possible question can be made but that the remaindermen cannot be liable to have the trustees reimbursed therefor out of their estate. The expenses of running the farm were expenditures for the benefit of the life estate and properly chargeable only upon it. If Charles B. Newell had been a life tenant, such expenditures made by him could not be imposed upon the remaindermen, and the trustees who held the estate for his life encountered, in making such expenditures, a similar restriction.

The contention, however, is that the expenditures for assessments for the reparation of the banks which preserved the meadows were of a different sort, and that in making them the trustees were benefiting the estate and the interests of the remaindermen, so that such expenditures should be properly chargeable to the remaindermen as a lien upon their estate. The question is whether the trustees in paying the sums assessed upon this farm for such reparation, and in thus preventing a "renting out" of the same for a term of years, may be subrogated for such payment to the rights of the meadow company or such person as the meadow company might have conveyed the land to, if the assessment had not been paid by the trustees. I do not think it open to question that the trustees owed no duty in this respect to the remaindermen. Their estate was an estate *pur autre vie.* There was no relation of trust or con-

fidence between them and those who had a vested remainder in fee. Like other life tenants, they were bound to keep down encumbrances, to make proper repairs and not to suffer waste of the estate. Upon the occurrence of a breach in the banks which tended to prevent the use of the meadow for the benefit of the *cestui que trust,* their duty to him, if they deemed it judicious, was to take such steps as would preserve his estate, and they could look to him and his estate for reimbursement, but I think they could not look for reimbursement to the remaindermen. Whether expenditure made for the original embanking of the meadows, assessed upon the meadows benefited, might not be chargeable upon the life tenant, and the remaindermen in equitable proportions need not be and is not decided. The expenditures in question were wholly for reparation. In this view the expenditures of the second class, above referred to, are not chargeable upon the remaindermen.

It may be added that if these expenditures are charged upon the remaindermen, they will be burdened with them although not made by themselves, nor by those who were their authorized agents, and which have been absolutely of no value to them, for it appears from the testimony taken by the master that the banks of those meadows have been entirely broken down and the land is comparatively valueless.

Th result is that I do not find any ground upon which the trustees can impose upon the lands in question any part of their expenditures. The mortgagee is, therefore, entitled to enforce his remedy by a sale of the property, and it will be unnecessary to return the report to the master for any further proceedings.